# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| LINDA FINKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:12-CV-124-JD |
| | ) | |
| TRUSTEES OF PURDUE UNIVERSITY, | ) | |
| and INDIANA UNIVERSITY, PURDUE | ) | |
| UNIVERSITY FORT WAYNE, | ) | |
| CHANCELLOR MICHAEL WARTELL, in | ) | |
| his individual capacity, and VICE | ) | |
| CHANCELLOR WILLIAM MCKINNEY, | ) | |
| in his individual capacity | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This is an employment discrimination case arising out of Plaintiff Linda Finke's

tenure as dean of the College of Health and Human Services at Indiana University Purdue

University-Fort Wayne ("IPFW"). Finke has sued the University, the Trustees of Purdue

University, and her former superiors, IPFW Chancellor Michael Wartell and Vice

Chancellor William McKinney, claiming that the Defendants (whom the Court will

collectively refer to as "IPFW") discriminated against her because she was a woman by

paying her less than similarly situated male employees and demoting her from her

position as a dean of the university, in violation of Title VII, the Fourteenth Amendment,

and the Equal Pay Act. Before the Court are Defendants' Motion for Partial Dismissal

[DE 49] and supporting memorandum [DE 50], both filed on January 23, 2014; and the

Defendants' Motion for Summary Judgment [DE 51] and supporting memorandum [DE

52], filed the same day. Finke responded to the motion to dismiss [DE 60] and the

motion for summary judgment [DE 58; DE 59; DE 61] on March 24, 2014, and the Defendants filed a reply in support of their motion for summary judgment on April 15, 2014 [DE 62]. For the following reasons, the motion to dismiss is **GRANTED** in part and the motion for summary judgment is **GRANTED**.

## I.    Motion to Dismiss

In her complaint [DE 1], Finke initially raised the following claims: (1) sex discrimination in violation of Title VII against all Defendants; (2) hostile work environment in violation of Title VII against all Defendants; (3) age discrimination in violation of the Age Discrimination in Employment Act against all Defendants; (4) violation of the Equal Pay Act against all Defendants; and (5) disparate treatment on the basis of sex in violation of the Fourteenth Amendment (made applicable against the state by 42 U.S.C. § 1983).

The Defendants have moved to dismiss a number of Finke's claims, as well as certain defendants from particular claims, because they are legally not actionable [DE 49]: specifically, they seek to dismiss defendant Purdue University Fort Wayne from the suit, because it is not a legal entity capable of being sued; the § 1983 claim against defendants Trustees of Purdue University, Michael Wartell, and William McKinney in their individual capacities, because they have Eleventh Amendment immunity from suit; the Title VII claims against defendants Michael Wartell and William McKinney in their official and individual capacities, because there is no Title VII individual capacity liability against supervisory employees; Finke's ADEA claim in its entirety; and Finke's Equal Pay Act Claim against Wartell and McKinney because there is no individual capacity liability for supervisory employees under the EPA [DE 50 at 1-2].

In her response to the motion to dismiss, Finke has agreed to dismiss all of these claims other than the Equal Pay Act claim against Wartell and McKinney [DE 60 at 3]. Additionally, in response to the Defendants' Motion for Summary Judgment, Finke has conceded that her hostile work environment claim is not legally supported, and agreed to dismiss the claim [DE 60 at 1, n.1; DE 61 at 7]. Accordingly, the motion to dismiss [DE 49] is **GRANTED** in part, and the motion for summary judgment [DE 51] on Count II is also **GRANTED**. Counts II and III are **DISMISSED**. Defendant "Purdue University Fort Wayne" is **DISMISSED**. Count I is **DISMISSED** against Defendants Michael Wartell and William McKinney. The request to dismiss Count IV, the Equal Pay Act claim, is discussed below.

## II.    Factual Background

With the underbrush cleared away, the following claims remain: a Title VII action for gender discrimination against Purdue University; a sex discrimination claim against Purdue University and Wartell and McKinney in their individual capacities under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; and an Equal Pay Act claim against Purdue University, Wartell, and McKinney. The legal matter of Wartell and McKinney's individual liability for the Equal Pay Act claim is discussed further below. The facts, as pertinent to these claims, are as follows:

### Finke's Start at IPFW

Dr. Finke began working at IPFW on October 10, 2005 as the Director of the Northeast Indiana Area Health Education Center [DE 52-1]. In that position, Finke was paid $68,000 per year [*Id.*]. Six months later, on April 17, 2006, Finke was offered the position of Dean of the School of Health Sciences and Professor of Nursing with tenure

[DE 52-2]. When she was considered for the position, Chancellor Wartell told other IPFW staff that he was impressed by Finke, that she brought a wealth of experience to the position, and that he was impressed by her suggested initiatives [DE 52-16 at ¶7]. In the Dean position, which she began July 1, 2006, her salary was $120,000, which included a $10,000 administrative stipend [DE 52-2]. At the time she was offered the Dean position, she was provided with a copy of IPFW's Executive Memorandum No. B-50, which outlined that her employment was terminable for cause [DE 52-2; DE 52-3 at 3; DE 52-18 at 10].

At the time Finke was hired as Dean, the Vice Chancellor of the University was a woman, Dr. Susan Hannah [DE 52-2; DE 58-1 at ¶10]. Finke's evaluations under Dr. Hannah for the academic years 2006-2007 and 2007-2008 were generally positive [DE 58-1 at ¶10; DE 58-1 at 12-15]. In those years, Finke received one paragraph letters indicating that Dr. Hannah recommended salary increases for Dr. Finke, and that Dr. Hannah would meet with Finke in person at a later time to review her performance [DE 58-1 at 12, 14]. When Dr. Hannah retired, she wrote Finke a three-paragraph letter that spoke of Finke's performance in glowing terms but did caution Dr. Finke that "you sometimes speak before you really have all the information, and sometimes with more feeling than fact. It takes time to get the whole picture" [DE 58-1 at 15]. According to Finke, Hannah informed Finke that the previous dean had a lax management style that had caused problems in the college, and therefore, Finke would have to take a more hard-line approach [DE 58-1 at ¶11].

Between 2006 and 2009, Chancellor Wartell reported that there were "continuing issues" with Finke's performance [DE 52-15 at 7]. Specifically, the department chairs in

the College of Health and Human Services were "afraid" of Finke, considered her a micromanager, and complained that Finke verbally abused them [*Id.*].  According to Wartell, numerous faculty members complained about Finke [DE 52-15 at 9].

Upon Dr. Hannah's retirement in 2008, Dr. McKinney became the Vice Chancellor of the University on July 1, 2008 [DE 52-22 at 5; DE 58-1 at ¶12].  Dr. McKinney did not issue written reviews to the deans underneath him; rather, he conducted verbal annual reviews [DE 52-22 at 7; DE 58-1 at ¶12].

### Formal Grievances Filed Against Finke

### 2009 Student Grievance

In 2009, Finke was the subject of a formal complaint filed by a student, who alleged that Finke discriminated against him on the basis of his sex, disability, veteran status, and age [DE 52-7 at 2; DE 52-15 at 4-5; DE 52-19 at 3; DE 52-23 at 2; DE 52-24 at ¶ 6; DE 58-1 at ¶17].  The student alleged that Finke provided inappropriate information to an outside entity where the student was doing an internship [DE 52-15 at 5; DE 52-23 at 2].  According to Finke, the dispute was due to the student having switched his major, not having appropriate prerequisites, and not being allowed to take courses in the College of Health and Human Services [DE 52-19 at 3; DE 58-1 at ¶17].

IPFW investigated the grievance: a University investigator investigated the complaint, produced a report, and the report was reviewed by Chancellor Wartell and a three-member panel selected from the University's Advisory Committee on Equity [DE 52-7 at 2; DE 52-15 at 4-5].  Additionally, Finke met with a University investigator and the panel [DE 52-7 at 2].

While the panel ultimately concluded that Finke did not discriminate against the student, it did conclude that Finke had "unreasonably interfered with [the student's] educational environment and unreasonably affected his educational opportunities" by failing to verify information that she had been provided about the student before passing along that information to the student's off-campus internship supervisors, not permitting the student to address concerns about him, and failing to advocate for the student [DE 52-7 at 2; DE 52-15 at 4-5; DE 52-19 at 3]. Accordingly, Chancellor Wartell and the panel directed Vice Chancellor McKinney to place a Letter of Reprimand in Finke's personnel file, and that the letter was to place her on probation for a period of time to be determined by the Vice Chancellor [52-7 at 3; DE 52-15 at 6; DE 58-1 at ¶ 17]. She was explicitly warned that "any further wrongful act . . . may result in disciplinary actions including and/or leading to your removal as Dean of the College of Health and Human Services and/or initiating procedures for dismissal" [DE 52-7 at 3].

Contrary to the terms of the letter, Finke claims that when she spoke to Wartell about the grievance, he told Finke "not to worry about it, not to lose any sleep about it," and that she was "one of the best deans he had," and that she "just had to take a hit for the University" [DE 52-18 at 4; DE 58-1 at ¶ 18]. Finke disagreed with the conclusion of the investigation and maintained that the investigator was "biased from the beginning" and "accused me of all these things instead of conducting an investigation" [DE 52-19 at 3].

The Letter of Reprimand, under Vice Chancellor McKinney's signature, indicated that Finke had committed "serious lapses in judgment and professionalism," and as a result, was placed on probation from July 1, 2009 through June 30, 2010 [DE 52-7 at 1]. She was again warned that any further wrongful act could result in her removal as Dean

or dismissal [*Id.*].  According to McKinney, before he reprimanded Finke, he spoke to both Wartell and the investigator of the complaint, and the Chancellor gave him a "preview" of what would be in the Chancellor's letter on the matter, but left to McKinney the "details" of what should be included in the reprimand [DE 52-23 at 3].

During Finke's year of probation, complaints about her performance decreased and she completed the probationary period without incident [DE 52-15 at 9; DE 58-1 at ¶ 19].  McKinney was "very pleased" with her performance, and reported to Wartell that Finke was "righting the ship" [DE 52-23 at 5-6; DE 58-5 at 8].

However, sometime in the fall of 2010, McKinney noticed a "marked increase in . . . informal complaints" regarding Finke, and began to see "a pattern emerge of very low morale in the college" [DE 52-23 at 6].  McKinney also reported that he became aware, from conversations with faculty senate leadership, including the speaker of the Indiana University faculty, faculty members, and department chairs, that members of Finke's department feared retaliation if they voiced disapproval of Finke [DE 52-23 at 7].  At the same time, McKinney says that Chancellor Wartell shared his concerns that Dr. Finke was micromanaging the college and had a problematic communication style [DE 52-23 at 6].  McKinney claims that he addressed these issues with Finke on at least one or two occasions, and she professed to be unaware of any problems [DE 52-23 at 7].  Finke denies having any such conversations and claims that McKinney never offered her advice for improvement or indicated to her that there were any complaints about her leadership style [DE 58-1 at ¶ 12].

## 2010 Dental Education Department Grievances

In November 2010, Finke, along with Connie Kracher, Chair of Dental Education and Director of the Dental Assisting Program, was the subject of two similar grievances in which she was accused of discrimination, one filed by Dr. Brenda Valliere, Chair of Dental Hygiene, and the other filed by Candy Ringel, Clinical Assistant Professor and Director of Dental Laboratory Technology [DE 52-8; DE 52-9; DE 52-10; DE 52-11; DE 52-24 at ¶¶ 7-8]. According to Finke, the University sought out complainants to file grievances against her [DE 52-18 at 7].

As with the previous harassment complaint, the grievances (which were so similar in nature that the University essentially treated them as a single case) were subject to an investigation: a University investigator wrote a formal report [DE 52-8 at 3-8], which was reviewed by a three-member panel of members of the Advisory Committee on Equity and Chancellor Wartell, and conducted meetings with Dr. Finke, Dr. Valliere, and Ringel [DE 52-8 at 1; DE 52-10 at 1].

The university investigator ultimately concluded that "Kracher and Finke favor an oppressive leadership style," with "little tolerance for any difference from their opinion [sic]," "managing details at every level and insisting on complete control" [DE 52-8 at 7; DE 52-10 at 7]. However, she opined, "[t]he evidence does not support a finding that . . . Finke's decisions or actions . . . have been motivated by retaliation;" rather, all indications were that "Kracher and Finke are simply not well liked by the faculty and staff in the Dental Education programs" [DE 52-8 at 7; DE 52-10 at 7]. To put a fine point on it, she concluded that "While I do believe that Kracher and Finke utilize micromanagement, abruptness, and annoyance as tactics, I do not believe they have

inappropriately targeted Valliere [or Ringel] through the use of intimidation, threatening or coercive behavior" [DE 52-8 at 7; DE 52-10 at 7].

Consistent with the investigative findings, the panel and Wartell ultimately concluded that Dr. Finke had not violated the University's Antiharassment Policy, but Wartell concluded that "the leadership exercised by Dr. Finke in supervising the College of Health and Human Services had a negative impact on the work environment, in general," which he described as "a matter of concern" [DE 52-8 at 1; DE 52-10 at 1]. According to Wartell, the "current environment in the Dental Education programs is not consistent with the IPFW culture and the collegial atmosphere which should be advanced by an administrator," and he referred the matter to Vice Chancellor McKinney "for a resolution which promotes collegiality and improves the workplace environment within Dental Education" [DE 52-8 at 1; DE 52-10 at 1-2].

**The IPFW Administrator Review Process and Upward Feedback**

IPFW has written guidelines outlining a review process for deans and directors: on an annual basis, all academic administrators above the level of chair are to "be evaluated annually by the Upward Feedback process," and "normally at five year intervals," the "Office of Academic Affairs will conduct a comprehensive review of each dean and academic unit director" [DE 58-1 at ¶ 14; DE 58-1 at 16].

"Upward Feedback" is similar to student evaluations of faculty, but completed by faculty members for administrators [DE 52-15 at 11]. Upward Feedback was administered for chancellors, vice chancellors for academic affairs, academic deans, and all senior administrators who have direct contact with faculty, and was an opportunity for faculty members to evaluate these administrators' performance [DE 52-22 at 8]. Upward

Feedback was anonymous and voluntary – meaning that faculty members were not required to participate [DE 52-22 at 8]. Evaluators would score administrators on a scale of 1 to 5, with 5 being the most positive, 3 being satisfactory, and 1 being the least positive, on a range of criteria [DE 52-4; DE 52-5; DE 52-6]. Because they were anonymous, McKinney considered Upward Feedback to give the evaluator the ability to be honest without fear of retaliation [DE 52-22 at 8]. He took Upward Feedback into account as one measure among many, and he would look for patterns over time in evaluating their import [DE 52-22 at 8; DE 52-23 at 10]. In making his decision to demote Dr. Finke, Dr. McKinney reviewed her Upward Feedback evaluations and took them into consideration [DE 52-22 at 9-10; DE 52-23 at 10].

Finke's overall scores on her Upward Feedback evaluations hovered around 3 for her entire tenure as dean. However, she consistently received a high number of low scores in areas concerning fostering a cooperative, collegial work climate; seriously considering faculty input regarding academic issues and policies; demonstrating flexibility and willingness to consider modifying a position given an appropriate rationale; serving effectively as a mediator in resolving problems among faculty; building positive relationships with faculty, administrators, and staff [DE 52-4; DE 52-5; DE 52-6; DE 52-22 at 10]. Finke consistently scored well in other areas, however, such as providing academic leadership and direction; making an effort to be available when needed; supporting faculty development in teaching and research; and working to ensure that policies and procedures enhanced the School's academic integrity [DE 52-4; DE 52-5; DE 52-6; DE 52-22 at 10]. According to Dr. McKinney, he and Finke discussed the negative collegiality and work atmosphere issues on "several occasions," and addressed

that she was "losing her faculty" [DE 52-22 at 10]. Finke, on the other hand, claims that no one from the University ever addressed her Upward Feedback evaluations with her [DE 58-1 at ¶ 25].

In addition to the quantitative scoring component of the Upward Feedback evaluations, evaluators also supplied qualitative comments. Again, Dr. Finke received some positive comments: for example, in 2008, one evaluator praised her "good ideas," called her "knowledgeable," and acknowledged that she was "trying very hard to establish good working policies for the College of HHS" and that "her direction is obviously needed" [DE 52-4 at 3]. But the same evaluator wrote that "[w]ithout intention, Dean Finke is coming off more as an intimidator instead of the qualified leader she clearly strives to portray" and described Finke's management style as having a "dictatorship approach," creating a "negative environment," and creating a situation where "faculty members do not wish to speak up anymore in fear of unconstructive criticism" [*Id.*]. The evaluator noted that Finke "shuts her mind and makes decisions without other true consideration;" "is not listening;" had a "controlling style of leadership;" "harshly interrupts people as they are talking" and "shuts them down;" and that she "must work on her communications with the faculty" [*Id.*]. In sum, the evaluator wrote, "[o]nce she develops an accepting communication style and trust with the faculty, she will become a more effective Dean for HHS" [*Id.*].

In 2009, the comments seemed to echo more of the same sentiments: Finke was described as "not very patient" and "seemed to throw up roadblocks . . . but has become more supportive recently;" having "motivational techniques . . . more based on threats and pointing out short comings [sic] rather than encouraging the faculty;" "dictatorial,"

"harsh, degrading, and does not work well with faculty" [DE 52-5 at 3-4]. One commenter wrote that "the morale in the College has significantly deteriorated . . . [f]aculty, staff, and students are treated disrespectfully by Dr. Finke. She makes inappropriate and demeaning personal and professional comments. . . . [h]er management style is dictatorial" [DE 52-5 at 3].

Other comments indicated that she had "made some obvious attempts to improve performance this year" and "tried to listen openly to departmental concerns and her attitude has fostered better team work . . . [h]er marked improvements have made this workplace more enjoyable. While there is more room to improve, she is on the right track!" [DE 52-5 at 3]. Others wrote that Finke "works dillgently [sic] to support faculty and students, listening to all parties and reviewing policies" [DE 52-5 at 4].

2010 brought more of the same: Finke was praised for having "fairly dealt with issues," but criticized for a "tendancy [sic] to micro-manage [sic]" [DE 52-6 at 3; DE 52-19 at 2]. One evaluator noted that "[i]n the last year, Dr. Finke has attempted to 'reach out' to the faculty members in a more relaxed atmosphere," but that such an effort would be unnecessary if Finke would simply treat faculty "with respect and dignity" [DE 52-6 at 4]. Other comments decried her operation of the college "like a tyrannical ruler" and as "dictatorial"; criticized her for being "harsh" and using "verbal insults and threatening comments;" creating a "hostile work environment," showing "no respect for anyone below her in the chain of command;" and having a leadership style that was "anything but collegial" [DE 52-6 at 3-4]. One evaluator described the morale at the College as "unbelievably low," resulting in the loss of talented faculty [DE 52-6 at 4]. Another described an atmosphere where faculty risked "serious repercussions" if they attempted

to communicate with any other administrator on campus, because Finke perceived any such information-seeking as "betrayal" [DE 52-6 at 4].

However, as McKinney noted, "she didn't receive zeros. She certainly had her supporters and very good qualities about her," though he was concerned with the "extremes" at the low end and what he perceived as the loss of respect from department chairs [DE 52-23 at 11].

**Faculty Complaints and Declining Morale**

In the fall and winter of 2011, McKinney observed "a pattern of rapidly declining morale in the college," "a pattern of department chairpersons who had lost confidence in their dean's leadership ability," and an increase in reports of "an atmosphere of fear . . . a fear of intimidation, a fear of retaliation" [DE 52-23 at 8]. However, McKinney never personally observed Finke retaliating against or intimidating anyone, nor did he see any actual evidence of retaliation or intimidation [DE 52-23 at 8]. However, he claims that the complaints "routinely" centered on Finke "calling a person out and yelling at them in front of their peers" if he or she disagreed with Finke in a department meeting [DE 52-23 at 8]. According to McKinney, every single department chairperson made a complaint about Finke [DE 52-22 at 10; DE 52-23 at 8].

According to McKinney, Dr. Sternberger, the chair of the Department of Nursing, complained that Finke was uncollegial, dictatorial, and a micromanager, and that Finke verbally berated her in front of her colleagues, eroding her ability to lead her faculty [DE 52-23 at 8]. McKinney claims that Sternberger complained to him on at least three or four occasions [DE 52-23 at 8]. For her part, Sternberger described Finke as competent in student matters and having some excellent skills, but a "micromanager" and a poor

dean [DE 52-26 at ¶¶ 5, 6]. Sternberger lacked confidence in Finke's leadership ability because she was manipulative and forceful, and she found morale in the college to be low and reported that many other faculty members were intimidated by Finke and feared disagreeing with her [DE 52-26 at ¶¶ 7, 8]. Finke screamed at Sternberger on multiple occasions, including once over the handling of a faculty discipline matter on which they disagreed [DE 52-26 at ¶ 9]. Sternberger complained to Chancellor Wartell in 2008 and spoke with McKinney "a few times" [DE 52-26 at ¶¶ 10-11].

McKinney estimated that Dr. John Niser, the chair of the Department of Family and Consumer Science complained to him on at least four or five occasions, where he requested that McKinney not tell Finke that he was coming to discuss Finke's leadership, which he found intimidating to his faculty members and undermined his ability to lead his department, a position shared by other department heads [DE 52-23 at 8-9]. Niser himself opined that because Finke was following in the footsteps of a somewhat lax dean, it was logical for her to err toward micromanaging the college at first, but that her behavior continued throughout her time as dean [DE 52-28 at ¶ 5]. Niser claims that he "did not have a problem working with Dean Finke," but acknowledged that 'some of the faculty in the College struggled" and that "[s]ome of the Department Chairs complained on a regular basis about Dean Finke's management style" and felt that they were not treated fairly by Dean Finke, which Niser perceived to be unintentional on Finke's part [DE 52-28 at ¶¶ 6,7]. According to Niser, he had "several" conversations with McKinney where McKinney indicated that he had received complaints regarding Finke, and Niser responded that Finke "may not be the best manager of people, but what she wanted for the college and what she did as Dean was well-intended" [DE 52-28 at ¶ 9].

Finke lost support from the faculty "because she was perceived by them as difficult to work for" [DE 52-28 at ¶ 11].

McKinney estimated that Connie Kracher, the head of the dental department, complained about Finke's management style on one or two occasions, in addition to other complaints from members of the dental department [DE 52-23 at 9]. Kracher describes Finke as "good at management," but struggling "with the leadership aspect of the job" [DE 52-27 at ¶ 5]. The faculty in Kracher's department complained to her about Finke's management style; specifically, she reported that Finke would interrupt faculty at meetings, who would then stop participating [DE 52-27 at ¶ 6].

McKinney recalled that he met with Ann Obergfell of the Department of Radiography on four or five occasions to discuss complaints about Finke [DE 52-23 at 9]. Obergfell, on the other hand, claims that she "did not have any issues working for Dean Finke, however, I did notice tension and issues within the College" [DE 52-29 at ¶ 5]. She also notes that other faculty in the college complained that Finke was a "micromanager" and that Finke cut off faculty during meetings, could be negative and inflexible, and caused low morale in the college [DE 52-29 at ¶¶ 5-8]. Obergfell described Finke as having good ideas and intentions and being generally supportive of Departmental initiatives [DE 52-29 at ¶ 7].

Finally, McKinney claimed that he met with the chair of human services, Pat Eber, at least four or five times, if not more [DE 52-23 at 9-10; DE 52-25]. Eber avers that tension was high and morale was low in the college during Finke's tenure, and that Finke took away autonomy afforded her under University guidelines; snapped at her and others; and called Eber during a family vacation and yelled at her so loudly that others

could hear her on the telephone [DE 52-25 at ¶¶ 7-9]. She describes Finke as unpredictable and authoritative, and claims that she refrained from confronting Finke about her controlling management style and stopped participating in Upward Feedback because she feared retaliation [DE 52-25 ¶¶ 10-11].

McKinney asserts that he addressed these issues with Finke "on several occasions," including just after the resolution of the student grievance, when he talked to her about her leadership style and the danger of losing her faculty [DE 52-22 at 10; DE 52-23 at 2].

**Finke's Demotion from Dean**

On March 29, 2011, Vice Chancellor McKinney met with Finke and asked her to resign her position as Dean of the College of Health and Human Services [DE 52-12 at 1; DE 52-19 at 4; DE 58-1 at ¶ 20]. McKinney testified that during the meeting, he had a letter on his desk, asking for her resignation, and that he gestured toward it, indicating that he wanted Finke to resign because of what was contained in the file [DE 52-23 at 11]. McKinney stated that he specifically pointed to language in the letter during his discussion with Finke [DE 52-23 at 11]. Finke, on the other hand, claimed at her deposition that McKinney pointed to a file, without identifying it, and "threatened that some supposedly damaging content therein would be revealed if I refused to voluntarily resign" [DE 58-1 at ¶20]. However, in a letter supporting the university discrimination complaint that she later filed against Wartell and McKinney, she wrote that McKinney had pointed to a file on his desk and "stated that the investigation of the complaint filed by Dr. Brenda Valliere and Candy Ringle [sic] indicated that I was not able to 'get along

with people','" indicating that McKinney had, in fact, identified the contents of the file [DE 52-13 at 4].

Finke declined to resign voluntarily, and on May 23, 2011, McKinney wrote to Finke, indicating that she would be terminated as Dean effective June 20, 2011 [DE 52-12 at 1; DE 58-1 at ¶ 22]. According to McKinney, Finke's termination was due to a failure to maintain a "cooperative, collegial work climate that enhances communication, trust, and productivity of and among faculty, staff, and students," in violation of IPFW policy [DE 52-12 at 1; DE 52-19 at 4]. The termination decision was made by Vice Chancellor McKinney, Finke's immediate superior, but supported by Chancellor Wartell, who McKinney discussed the termination with prior to its issuance [DE 52-13 at 8; DE 52-14 at 1; DE 52-15 at 10-11; DE 52-23 at 4, 6]. However, according to Finke, McKinney removed her only because "Dr. Wartell told him to," and that McKinney was "frightened" of Chancellor Wartell [DE 52-18 at 5-6].

Following Finke's termination, Carol Sternberger, the female chair of the Department of Nursing, served as the interim dean [DE 52-18 at 3; DE 52-23 at 1]. Later, Ann Obergfell, previously the female chair of the Department of Radiography, was named Dean of the College of Health and Human Services [DE 52-18 at 3; DE 52-29 at ¶ 3].

For her part, Finke announced her termination to the University via email [DE 58-1 at 22], and in response, received a number of emails from staff who had previously reported to her expressing their support for her and dismay at her termination [DE 58-1 at ¶¶ 23-24]. The emails praised Finke as "a source of support and inspiration;" "incredibly supportive and approachable;" a "true leader;" "beneficial to students and the university;"

expressed admiration for her "leadership and guidance" and "assertiveness," and expressed general disagreement with her removal as dean [DE 58-1 at 24-34].

Following her termination as Dean, Finke maintained her tenure and rank as Professor of Nursing, and McKinney offered Finke another administrative position at IPFW with no reduction in pay, including the administrative stipend that Finke received as Dean [DE 52-12; DE 52-18 at 3]. In June 2011, Finke and McKinney corresponded regarding Finke's employment in the newly created position of Director of Inter-Professional Education and Practice, the position that Finke presently holds [DE 52-12; DE 52-18 at 2; DE 52-21 at ¶ 8]. She is also a professor and Executive Director of Health Clinics and Special Programs [DE 58-1 at ¶3]. In her present position, Finke was given secretarial support (though to a lesser degree than she had as dean), an office, albeit a smaller one, and a paid sabbatical and teaching load [DE 52-12 at 3; DE 52-18 at 3; DE 52-21 at ¶ 8, DE 58-1 at ¶ 22]. Finke retained her entire total compensation amount, which included both her salary and administrative stipend [DE 52-21 at ¶ 8]. However, she is no longer in charge of managing a program's budget and supervises a far smaller group of employees than she previously did [DE 58-1 at ¶ 22].

Finke contends that she and her colleague, Kathleen O'Connell, who was the Associate Vice-Chancellor for Community Engagement, were the two highest ranking female administrators at IPFW, and that they were both subjected to staff grievances and asked to resign at approximately the same times [DE 58-1 at ¶¶ 19, 21].

**Compensation of Deans at IPFW**

Vice Chancellor McKinney had responsibility for initial determinations about Deans' salaries, but Chancellor Wartell bore final authority for salaries [DE 52-21 at ¶ 4].

During the time Finke was employed as Dean, IPFW used data provided by The College and University Professional Association for Human Resources ("CUPA") as a guideline for employee salaries [DE 52-16 at ¶ 4; DE 52-21 at ¶ 4]. CUPA collected salary data from colleges and universities, and based on CUPA's annual salary survey data, colleges and universities, like IPFW, could determine appropriate market rates and select salary levels for faculty and administrators [DE 52-16 at ¶ 4; DE 52-21 at ¶ 4].

Dean's salaries at IPFW consisted of two parts: a base salary as a professor in a home department and an administrative stipend for serving as dean of a college [DE 52-16 at ¶ 5; DE 52-18 at 8-9]. Based on CUPA median salaries, salaries for faculty in certain departments, such as Engineering and Business, were higher than salaries for faculties in the Humanities, Nursing, or Continuing Education [DE 52-16 at ¶ 5; DE 52-18 at 8-9]. Finke acknowledges that IPFW uses CUPA data to set salaries, including hers when she was hired in 2006, and that at that time, she had no complaints with her salary [DE 52-18 at 10].

Finke was the only female Academic Dean at IFPW during her time as Dean [DE 58-1 at ¶ 5]. The Director of Continuing Studies and the Library Dean were females, though they differed from Academic Deans in that their departments were not degree-conferring, among other reasons [DE 52-15 at 10; DE 58-1 at ¶¶ 6-7]. Finke claims that while she was employed as a dean, all of the other male deans at IPFW earned more than she did, despite the fact that the College of Health and Human Services generated a large number of credit hours and brought in more external grant and contract money than any other deans [DE 58-1 at ¶¶ 9, 13].

In 2007-2008, there were five full-time Academic Deans at IPFW and one interim dean [DE 52-17 at 2]. Finke and one other male dean, Marc Lipman of the College of Arts and Sciences, were paid at a rate above the CUPA median [DE 52-17 at 1]. [1] The other three full time deans, all male, were paid at a rate below the CUPA median [DE 52-17 at 1]. The Dean of the College of Education, Dean Kanpol, was paid less than Finke [DE 52-17 at 1]. However, for the rest of her time as Dean, Finke was the lowest-paid Dean at IPFW [DE 52-17].

From the 2007-2008 academic year until the time she was demoted, Finke was paid at a rate higher than the CUPA median for deans of nursing programs at other institutions [DE 52-17]. During those years, some male deans were paid at a level below the CUPA medians for their programs [DE 52-17]. For the academic years spanning 2007-2011, the CUPA median for the Dean of Nursing was lower than the CUPA medians for Deans of Colleges of Arts and Sciences, Business, Education, Engineering, and Visual and Performing Arts [DE 52-17].

At the time of Finke's demotion, here is what the other salaries were for deans at IPFW, including their administrative stipends. The figure in parentheses is the CUPA median for other masters granting institutions:

Drummond, Arts and Sciences: $143,067 ($129,918)

Chang, Business: $163,412 ($150,000)

Kanpol, Education: $139,747 ($125,000)

Yen, Engineering, Technology, and Computer Sciences: $161,718 ($169,298)

---

[1] The data provided by IPFW uses the CUPA median for "all institutions" for 2007-2008 through 2008-2009, which includes institutions granting Doctoral, Masters, and Baccalaureate degrees. IFPW does not grant Doctoral degrees, but IPFW has asserted that there is no CUPA data for masters-only institutions for these years. The data for 2009-2010 and 2010-2011 is the median for Masters- and Baccalaureate-granting institutions [DE 52-17 at n.2].

Finke, Health and Human Services: $138,125 ($120,084)

O'Connor, Visual and Performing Arts: $143,318 ($138,075)

[DE 52-19 at 9]. Finke's salary at the time of her termination was $127,695, and her administrative stipend was $10,430. Before Finke assumed the position of Dean of the College of Health and Human Services, Dr. Jim Jones held the position. In the academic year of 2004-2005, the year before Dr. Finke started, he was paid $118,320 [DE 52-20 at ¶7].

**Other Deans Demoted by McKinney**

When demoting a faculty member from Dean back to a professorship, it was Dr. McKinney's practice to have a face-to-face meeting with the individual and ask him or her to voluntarily resign the position, so that the person was able to "control the message" and "move back into that faculty role on their own terms" [DE 52-22 at 6]. In November 2008, Dr. McKinney asked the Dean of the College of Arts and Sciences, Dr. Mark Lipman, to step down as Dean [DE 52-22 at 5]. Dr. Lipman voluntarily resigned, as did Dr. Gerald Voland, whom McKinney asked to resign from his deanship of the College of Engineering Technology and Computer Science because he had become "detached from the day-to-day operation of his college" [DE 52-22 at 6; DE 52-23 at 11].[2]

According to Dr. McKinney, Dr. Lipman was asked to resign because McKinney observed that he was "losing the respect of his faculty. The college was in many ways strategically adrift" [DE 52-22 at 7]. McKinney also noted that Lipman was "detached" from the operations of the College of Arts and Sciences and that there were no new

---

[2] Finke asserts that following her demotion, another dean, Dean Kanpol, was asked to resign from his position [DE 58-1 at ¶¶ 15-16]. There is scant evidence regarding Dean Kanpol's demotion in the record, and given that his demotion occurred after Finke's demotion and the events giving rise to this lawsuit, the Court will conduct its analysis without consideration of Kanpol's demotion.

initiatives or programs [DE 52-22 at 9]. McKinney received both oral and written complaints about Dr. Lipman's performance [DE 52-22 at 7]. Both Voland and Lipman were also delinquent in getting reports in on time, according to McKinney's own personal observations and reports from others in his department [DE 52-22 at 9; DE 52-23 at 11].

According to Finke (with no factual support or citation), Upward Feedback has never been used for personnel decisions involving Deans and Directors; rather, the five-year evaluations "were supposed to be utilized" [DE 58-1 at ¶ 25]. However, in addition to the written and oral complaints concerning Lipman and Voland, in both cases, McKinney looked to their Upward Feedback in making his decisions to demote them [DE 52-22 at 9; DE 52-23 at 12].

According to Finke, Deans Lipman and Voland were given their five year reviews prior to being asked to resign, whereas she was not [DE 58-1 at ¶¶ 14-16]. Finke contends that she knows that the reviews were conducted of these deans because she personally participated in the reviews [DE 52-1 at ¶ 15]. IPFW counters that while Dean Lipman was given his five year review, it was initiated and completed before McKinney started working at IPFW; that no such review was done for Dean Voland; and that contrary to her assertion, Finke was not a member of Lipman's review committee [DE 62-1 at ¶ 5; DE 62-2 at 2].

**Wartell's Treatment of Finke**

Finke asserts that in late 2010, Wartell and McKinney began treating her "with great disrespect," and that she was "marginalized" and "berated in meetings," and that Wartell subjected her to "inappropriate language" [DE 58-1 at ¶ 19]. McKinney testified that Wartell could be "hot-headed," and that Wartell had directed that behavior at both

him and Finke.  He once observed Wartell raise his voice to Finke when she interrupted him during a University meeting [DE 58-5 at 10; DE 52-23 at 5].

**Wartell's Lawsuit Against Purdue**

In 2013, Chancellor Wartell filed a lawsuit against IPFW, alleging that in late 2010 or early 2011, Purdue University's president, France Cordova, a woman, pointed to a picture of him during a meeting and claimed that she was going to replace him with a woman, and that he was subsequently forced to take early retirement against his will to allow Cordova to replace him with a woman [DE 58-2].  According to Wartell, he first learned of this incident in mid-July 2011 [DE 62-3 at 1].

**III.     Summary Judgment Standard of Review**

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  So the Court must construe all facts in the light most favorable to the nonmoving party, making all legitimate inferences and resolving all doubts in its favor.  *Cung Hnin v. TOA, LLC*, 751 F.3d 499 (7th Cir. 2014).  A "material" fact is one the substantive law identifies as impacting the outcome of the suit.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  When there is a genuine issue as to any such material fact and a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment is inappropriate.  *Id.*  Conversely, where a factual record exists that would not allow a rational jury to find for the nonmovant, there is no genuine issue of fact for trial and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 289 (1968)).  Though the Court must construe the facts in the light most

favorable to the non-moving party, she cannot simply rest on the allegations or denials contained in her pleadings: she has to present sufficient evidence to show the existence of each element of her case on which she will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV.     Finke's Title VII and § 1983 Discriminatory Demotion Claims

Finke alleges that she was demoted from her position as dean because she was a woman.  She raises these claims under Title VII and §1983.  Analysis of these two claims is essentially the same, though individual defendants have no liability under Title VII, whereas they may under §1983.  *Egonmwan v. Cook Co. Sheriff's Dep't.*, 602 F.3d 845, 850 at n.7 (7th Cir. 2010); *Passananti v. Cook Co.*, 689 F.3d 655, 662 at n. 4 (7th Cir. 2012).

To avoid summary judgment on her Title VII and § 1983 discriminatory demotion claims, Finke must either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue of fact, which is the "direct" method; or, in the alternative, she can establish a prima facie case under the *McDonnell Douglas* burden-shifting formula, which is the "indirect "method.   *Id.* at 849-850.  To make the prima facie case, she must prove that (1) she is a member of a protected class; (2) her job performance met IPFW's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual outside her protected class was treated more favorably.  *Egonmwan*, 602 F.3d at 850.  If Finke can make that showing, then the burden shifts to the defendants to counter with legitimate, non-discriminatory reasons for their actions, and if they can do so, then the burden shifts back to Finke to show that the proffered reasons are a pretext for discrimination.  *Id.*

A discussion of just what Finke bears the burden of showing to defeat a motion for summary judgment is appropriate here. Finke argues that the Seventh Circuit has somehow (to her benefit) eliminated the distinction between the direct and indirect methods and "espoused" a "new standard" in *Morgan v. SVT, LLC*, 724 F.3d 990 (7th Cir. 2013) [DE 61 at 8]. This is incorrect: as the defendants properly argue, though the *Morgan* court decried the sometimes confusing distinctions and rigid formulations of the direct and indirect methods of proof, it was clear that "[t]he real distinction between these two methods . . . is not whether one relies solely on 'direct' evidence (in the sense of a smoking gun) and the other relies on circumstantial evidence." *Morgan,* 724 F.3d at 995. Rather, the court articulated, under the direct method, a plaintiff may use *both* direct evidence linking an adverse employment action to discriminatory animus, *as well as* circumstantial evidence that, "taken as a whole [would] permit that inference" – the inference being that the adverse employment action was linked to the discriminatory animus. *Id.*

There are three types of circumstantial evidence a plaintiff can present under the direct method. The first is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 394 (7th Cir. 2005) (citations and quotations omitted). The second type of circumstantial evidence is statistical evidence showing that "employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Id.* (citation and quotation omitted).

The last kind of evidence is "'evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.'"  *Id.* (quoting *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).  With such circumstantial evidence, the "key consideration is the totality of these pieces of evidence, none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff."  *Id.* (internal citations, quotations, and alterations omitted).

*Morgan* cautioned against a rigid distinction between the direct and indirect methods because some evidence may overlap with the direct – circumstantial approach and the indirect approach, and tried to explain that the "direct" method is not synonymous with direct evidence, and the indirect with circumstantial – a plaintiff can make her case under the direct method using both direct and circumstantial evidence.  *Morgan*, 724 F.3d at 995-96.

A plaintiff who wishes to avail himself of the indirect method may do so by presenting evidence of the prima facie case prescribed by *McDonnell Douglas.  Morgan*, 724 F.3d at 996.  The problem, according to the *Morgan* court, arises when a plaintiff is harmed by her failure to specify if she wishes to proceed under the direct or indirect method.  *Id.*  As a result, the *Morgan* court recommended making the direct approach the "default" rule, for such an approach "prevent[s] no one from using the 'indirect' approach," but removes "some of the rigidity from the system that has developed over the years."  *Id.* at 997.

In this case, Finke contends that she can proceed under either approach, but seems to focus on proceeding under the direct method with circumstantial evidence [DE 61 at 8]. In any event, "[t]he plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him because of his [sex]." *Id.* at 997. And so the Court's task here is to assess whether Finke has provided enough evidence, direct or circumstantial, to permit a jury to find that the defendants demoted her because she was a woman. She has not. The Court will examine each of her claims below.

## A.    Direct Method

First, assessing Finke's claim that she was demoted from her position as dean on the basis of her sex under the direct method, there is a dearth of direct or circumstantial evidence that would allow the factfinder to determine that she was demoted *because she was a woman.* She simply has no evidence, direct or circumstantial, that links her removal as dean to a discriminatory animus, other than her own conjecture and surmise, and "[u]ltimately, this evidence is only speculation that the conduct was the result of gender discrimination and reliance on speculation is not enough to get the case to a jury. *Overly v. KeyBank Nat'l. Ass'n.*, 662 F.3d 856, 864 (7th Cir. 2011) (citing *Davis v. Carter*, 452 F.3d 686, 697 (7th Cir.2006)) (explaining that "when the evidence provides for only speculation or guessing, summary judgment is appropriate"). Although Finke may believe that the defendants' actions were motivated by a discriminatory animus, the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact." *Hanners v. Trent,* 674 F.3d 683, 694 (7th Cir. 2012), quoting *McMillian v.*

*Svetanoff*, 878 F.2d 186, 190 (7th Cir.1989).  Essentially, Finke contends that she is a woman, she was fired by men, and therefore, gender discrimination was at play. However, she has failed to present evidence to bridge that gap.

As discussed above, the usual types of circumstantial evidence that would support such an inference are suspicious timing or ambiguous statements or behavior towards other employees in the protected group; evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and evidence that the employer offered a pretextual reason for replacing Finke with someone who was a different gender.  *Morgan*, 724 F.3d at 995.

The third type of evidence can be ruled out very quickly, because Finke wasn't replaced by someone who was a different gender.  The interim dean of the College of Health and Human Services, Carol Sternberger, was a woman, as was the later-appointed permanent Dean, Ann Obergfell.  That the defendants installed a woman in Finke's place as dean puts her claim that she was fired *because she was a woman* on rather suspect footing to begin with, but the Court will proceed with the analysis.

Finke's primary argument is that she can present evidence of suspicious timing: essentially, her argument is that she had no bad reviews from McKinney's predecessor, a female, and that she did not receive bad reviews until McKinney, a man, became her boss, which was "not coincidentally" around the same time as Purdue's female president threatened to replace Wartell with a woman [DE 61 at 8-9].  As far as the Court can tell, Finke's theory is that Wartell was thus somehow motivated to fire female administrators, because he was being discriminated against on the basis of *his* gender, and accordingly, he influenced or caused McKinney's decision to demote Finke.

As an initial matter, "[w]hile suspicious timing is relevant evidence that can raise a genuine issue of fact about discrimination, suspicious timing alone is rarely enough to survive summary judgment." *Morgan*, 724 F.3d at 998 (citing *Lewis v. City of Chi.*, 496 F.3d 645, 655–56 (7th Cir.2007)) (internal citations omitted). Where reasonable, non-suspicious explanations for the timing of the adverse employment action exist, the Court should not deny summary judgment solely on the basis of suspicious timing. *Id.*

There are a few flaws with Finke's argument here. First of all, the defendants maintain that it was McKinney, not Wartell, who made the decision to demote Finke, and McKinney had no discriminatory animus (nor, for that matter, did Wartell, according to the defendants). That McKinney was the decisionmaker who demoted Finke is supported by the evidence: both McKinney and Wartell testified that McKinney, as Vice Chancellor, had the authority to demote deans, that he made the decision, and that Wartell supported and agreed with the decision. And there is no evidence, direct or circumstantial, that McKinney himself harbored any sort of discriminatory animus.

To prevail on her claim, Finke must show that the decisionmaker responsible for the contested decision harbored a discriminatory animus. *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011). Other than Finke's conjecture that it is a "tough sell" to believe that Wartell had the ability to direct McKinney to reprimand Finke in the grievance context, but did not have the authority to demote Finke as dean [DE 61 at 9], no evidence has been presented to contradict this evidence, and her speculation alone is not sufficient to create a triable issue of fact on this point. *See Naficy v. Ill. Dep't. of Human Svcs.*, 697 F.3d 504, 513 (7th Cir. 2012). Further, whether

Wartell had the authority to demote Finke is not at issue here: the evidence is that he *didn't* demote her, that McKinney did, and Wartell supported the decision.

To get around this roadblock, Finke contends that the "cat's paw" theory is applicable to prove that Wartell was actually the decisionmaker, and that he harbored a discriminatory animus because he himself was the victim of gender discrimination and that he treated Finke with "disrespect" [DE 61 at 9; DE 58-1 at ¶ 19]. "In employment discrimination cases, the 'cat's paw' is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias. With sufficient evidence, we permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision." *Schandelmeier-Bartels*, 634 F.3d at 379.

Here, she argues, Wartell, who adjudicated the grievances against Finke and directed McKinney to reprimand her as a result, did so because of a gender bias that was the result of Cordova's directive, and since Wartell's adjudications of the grievances played a role in Finke's demotion, Wartell used McKinney as a cat's paw and there is causal connection between Wartell's bias and McKinney's decision to demote Finke.

This argument fails. Even if the Court were to accept Finke's argument that McKinney was, in fact, somehow Wartell's "cat's paw" to shoehorn the evidence about Wartell's lawsuit to fit Finke's theory, there is no evidence that Wartell knew about Cordova's statement that she planned to replace him with a woman until well *after* Finke had been asked to resign, refused, and was removed from her office as Dean – much less when he was adjudicating the two grievances against her. In other words, even assuming that Cordova's actions created a discriminatory animus on Wartell's part, there is no

evidence that Wartell had a discriminatory animus until *after* the adverse action that Finke is now contesting – which means that Finke's so-called "suspicious timing" is not so suspicious, and there cannot be a causal connection between the two events.[3] Moreover, the evidence that Wartell harbored a gender bias because he was "hot-headed" towards Finke is unavailing – McKinney testified that Wartell was hot-headed towards him as well.

The same problem plagues Finke's evidence regarding the demotion of O'Connell: Finke claims that she was "subjected to a pattern of continual grievance filings by co-workers," as was, "[c]oincidentally," O'Connell [DE 61 at 4; DE 58-1 at ¶¶ 18-19], who was also asked to resign during "the very same time period that Wartell maintained" that Cordova tried to replace him with a woman [DE 61 at 5]. First, the record is completely devoid of any factual support whatsoever regarding grievances filed against O'Connell, or, for that matter, her performance, responsibilities, or the events surrounding her dismissal and who was responsible for it. Finke's conjecture, absent any supporting facts, that their demotions were somehow part of a concerted effort by IPFW to remove women from administration is simply not evidence that can support her attempt to defeat summary judgment. *Overly,* 662 F.3d at 864. Second, even if O'Connell was asked to resign at the same time as Finke, the timing component would be similarly off: Wartell did not know about Cordova's statements until after Finke's demotion. And finally, as Finke herself admits, the grievances were filed by her co-workers, and not Wartell or McKinney, so it is unclear how they or the University could

---

[3] Additionally, the "cat's paw" theory permits a jury to draw such an inference, which would, ordinarily, make this a jury question and not appropriate for resolution on summary judgment. However, the application of this theory is not appropriate for a jury in this case, because the uncontested factual basis for the theory is nonexistent.

be held responsible for the grievances. And while Finke was cleared of violating the University's anti-harrassment policy on each occasion, the grievances were not "meritless," as she claims: they unearthed deficiencies in her performance that were referred to her immediate superior for discipline.

Finke also claims, on the suspicious timing front, that she "had an incredible academic and performance record at IPFW under her female Vice-Chancellor," and that "since Hannah conducted regular reviews and expressed the results thereof in writing there is ample evidence of her fine performance," and that "not until a male, McKinney, took the helm did that change" [DE 61 at 8]. This is not exactly accurate: while it is correct that Dr. Hannah provided yearly letters to Finke indicating that Hannah's impressions were positive and that she recommended Finke for salary increases, the letters were short, were not written performance reviews, and explicitly indicated that Hannah and Finke would be meeting in person at a later point to discuss her performance [DE 58-1 at 12, 14]. It also ignores that upon Dr. Hannah's retirement, she wrote a letter to Finke praising her performance, but cautioning her that "you sometimes speak before you really have all the information, and sometimes with more feeling than fact. It takes time to get the whole picture" [DE 58-1 at 15]. In other words, Dr. Hannah's "written reviews" were very similar to McKinney's annual oral reviews (which Finke contends were somehow discriminatory or in place to avoid generating paperwork that would later support her claims), and her appraisal of Finke's performance seemed to mirror what was borne out later by Finke's Upward Feedback: she performed well in many respects, but with a perhaps questionable management style.

Moving on to the second type of evidence, Finke cannot establish that male deans were given systematically better treatment. Dean Marc Lipman was demoted from his post as head of the College of Arts and Sciences, and Dean Gerald Voland was similarly demoted from his post at the head of the College of Engineering. Finke asserts that she was treated less favorably than these demoted deans, because they were given a comprehensive five year review prior to their demotions, whereas she was not – because, she speculates, such a review would have created documentation that would support or deny her demotion, which the defendants hoped to avoid [DE 61 at 12-13].

This argument is a non-starter for a few reasons. First, though Dean Lipman was given a five year review, there is no evidence that Dean Voland had such a review. IPFW has no records of such a review. Second, while Finke asserts that this was IPFW's policy, it is mentioned only in the form of a guideline. Third, even assuming that Voland and Lipman were given their five year reviews, it does not appear that Finke was due for a five year review until *after* she had been removed from the position of dean – she was offered the position in April 2006, and it took effect in June 2006, which means that she would have been first due for a five year review in June 2011 – at which point she had already been asked to resign.

B.    **Indirect Method**

Under the indirect method, Finke fares no better. For purposes of their summary judgment motion, the Defendants have conceded two prongs of the *McDonnell Douglas* prima facie case: that Finke is a member of a protected class because she is a woman and that she suffered an adverse employment action in the form of her demotion [DE 52 at 27]. But Finke's claim founders on the other two prongs: whether her job performance

met IPFW's legitimate expectations and whether another similarly situated individual outside her protected class was treated more favorably.

First, Finke has failed to establish that she was performing her duties as dean in a way that would meet IPFW's legitimate expectations. The record is replete with evidence showing that although Finke's subordinates thought that she was performing well in some areas, they were highly dissatisfied with the work environment that Finke created – she was described as "dictatorial" multiple times. And though Finke was cleared of violating IPFW's antiharrassment policy on the three occasions she was charged, each of the investigations unearthed other shortcomings on her part so severe that the matters were referred to Finke's boss, the Vice Chancellor, for discipline. So while Finke is correct in her assertion that the investigations all resulted in her having been found to be in compliance with IPFW's antiharrassment policies and those particular infractions could not support IPFW's decision to demote her, she ignores that the investigations turned up other evidence of her having failed to meet the university's legitimate expectations regarding the creation of a collegial work environment.

Second, as discussed above, Finke has not established that other male deans were treated more favorably by not being demoted from their positions. As previously outlined, McKinney demoted at least three deans during his tenure as Vice Chancellor. Lipman received a five year evaluation; Voland did not; and Finke did not. Even if both Voland and Lipman were given their five year evaluations, the evidence is that Finke herself was not yet even due for her five year evaluation. This evidence simply does not demonstrate that others outside of the protected class were treated more favorably.

Moreover, the same guideline that Finke argues mandates five year reviews of deans explicitly notes that the appropriate process for yearly assessment of deans was Upward Feedback – contrary to Finke's contention that Upward Feedback was not to be utilized for making employment decisions and should not have been considered in her demotion. Moreover, McKinney testified that he did, in fact, consider Voland and Lipman's Upward Feedback in their demotions – just as he did with Finke. And as discussed at length above, though Finke received some strong Upward Feedback evaluations, her evaluations were consistently low in areas relating to collegiality, openness, and morale.

Finally, even assuming that Finke could establish that she was meeting IPFW's legitimate expectations and that Lipman could be considered a similarly situated employee who was treated better than she was, IPFW would still be entitled to summary judgment because it has offered a legitimate, non-discriminatory reason for demoting her, and Finke cannot prove that the reason is pretextual. IPFW has proffered that based on the poor Upward Feedback relating to Finke's management style, oral complaints from Finke's department heads, and the results of the three grievance investigations, McKinney removed Finke as dean of the College of Health and Human Services for a failure to maintain a "cooperative, collegial work climate that enhances communication, trust, and productivity of and among faculty, staff, and students" [DE 52-12].

While the evidence supporting the reason given for Finke's demotion certainly overlaps with the discussion above regarding whether Finke was meeting IPFW's legitimate performance expectations, it is worth noting here that even if the Court were to have found that Finke *had* been meeting IPFW's expectations, if McKinney himself

honestly believed that Finke had failed to maintain a cooperative and collegial work environment, as he wrote in the letter demoting her, then the reason is not considered pretextual, for "[p]retext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (internal citation, quotation, and alteration omitted). So if McKinney found Finke's performance to be subpar, as he himself testified that he did – even if she *wasn't* actually performing poorly, as she claims that she wasn't – then IPFW has articulated a non-discriminatory reason for her demotion.

To demonstrate that IPFW's proffered reason is pretextual, Finke raises a number of similar arguments. First, she argues that McKinney's assertion that she was demoted for failure to maintain a collegial work environment is belied by the number of supportive emails that she received from her colleagues upon her demotion, as well as the lack of supporting documentation relating to the oral complaints that McKinney and Wartell received about Finke [DE 61 at 5-6]. She also argues that Upward Feedback did not represent an appropriate sampling of her colleagues and should not have been considered in her demotion [DE 61 at 10-11]. Finally, she asserts that because she was never informed by McKinney or Wartell that there were problems with her performance, the University is simply using the Upward Feedback as a pretextual reason to explain her demotion.

None of these arguments establishes that the University's stated reason for Finke's demotion – failure to maintain a collegial environment in her college – is pretextual. First, McKinney testified that Finke's Upward Feedback was not the sole

basis for her demotion, because he also considered the results of the three grievance investigations as well as oral feedback and complaints that he received. Moreover, he considered Upward Feedback in the demotions of the other deans that he asked to resign, so Finke's assertion that it was not to be used in making personnel decisions (which is not supported with any factual evidence) is neither here nor there. Moreover, the very guideline that Finke argues establishes the five year review process explicitly states that Upward Feedback is the appropriate yearly metric for evaluating administrators.

Second, though Finke and McKinney have given differing accounts of whether McKinney ever addressed his concerns about Finke's management style with her, even crediting Finke's version of events, as the Court must at this stage, this is not evidence of pretext. There is no dispute that Finke was formally reprimanded as a result of the grievances filed against her, and that she was informed of those reprimands. She was placed on probation as a result of the first grievance. It is impossible that Finke was not on notice that there were issues with her management style.

Finally, Finke contends that the affidavits of the department heads of the College of Health and Human Services do not state that the department heads complained about Finke's performance, and they do not represent an adequate sampling of her colleagues [DE 61 at 11-12]. This is simply incorrect: each of the submitted affidavits – which are from the department heads Finke supervised, not just a random sampling of disgruntled employees – indicates that the department head did in fact speak to McKinney about Finke's performance. None of the affidavits contradicts McKinney's testimony that the department heads complained to him about Finke's management of the college, and Finke has presented no affidavits to that effect. And the emails that Finke received

following her demotion, while certainly supportive of her, do not somehow render as moot the sworn affidavits of the department heads. As McKinney himself noted, Finke was certainly not without supporters. But demonstrating that a stated reason for an action was pretextual "requires more than showing that the decision was mistaken, ill considered or foolish," and the evidence is clear that McKinney "honestly believed" that Finke had failed to maintain a collegial work environment, "and so long as the employer honestly believes those reasons, pretext has not been shown." *See Balance*, 424 F.3d at 617.

Accordingly, summary judgment is appropriate on these counts.

## V.     Discriminatory Pay Claims Under Title VII and the Equal Pay Act

Finke also argues that IPFW paid her less than other male deans in violation of Title VII and the Equal Pay Act. Though Finke's claims here are essentially identical – and the parties have treated them identically – the Equal Pay Act and Title VII present independent remedies, and Title VII's coverage of equal pay claims is broader than the EPA's. *Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 703 (citing *County of Washington v. Gunther*, 452 U.S. 161, 178-80 (1981)). In a Title VII suit, the plaintiff must allege that her lower pay was the result of discrimination; whereas for an equal pay claim, she must show that a male employee was paid higher wages for equal work performed under similar conditions, and intent need not be shown. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 656 (7th Cir. 2010) (citing *Cullen*, 338 F.3d at 704; *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998)). Accordingly, the Court will address each of Finke's claims separately.

## A.      Equal Pay Act

The Equal Pay Act prohibits employers from paying employees different wages based on gender.  29 U.S.C. § 206(d); *Warren v. Solo Cup Company*, 516 F.3d 627, 629 (7th Cir. 2008).   To establish a prima facie case of wage discrimination under the EPA, a plaintiff must show, by a preponderance of the evidence, that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Id.*  No proof of discriminatory intent is required. *Id.*; *Cullen,* 338 F.3d at 699.

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to establish one of four statutory defenses, "which kick in if the difference in pay is attributed to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  *Warren*, 516 F.3d at 620; 29 U.S.C. § 206(d).  The last exception is a "broad, 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Warren*, 516 F.3d at 620 (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir.1989)).   In other words, the EPA establishes a rebuttable presumption of sex discrimination where an employee shows that an employer pays members of one sex less than members of the opposite sex; and the employer can rebut the presumption by offering a gender neutral justification for doing so.  *Warner*, 516 F.3d at 629.  The justification need not be a "good reason," but it has to be bona fide and gender neutral – the employer "cannot use a gender-neutral factor to avoid liability

unless the factor is used and applied in good faith." *Id*. (quoting *Fallon*, 882 F.2d at 1211).

The parties have spilled much ink arguing about whether the EPA provides for liability against individuals in a supervisory capacity, such that Finke can sue Wartell and McKinney [DE 50 at 9-11; DE 60 at 1-2]. The Seventh Circuit has not decided the issue, *see Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 2010 WL 1779904, at *7, n.28 (N.D. Ind. April 30, 2010), and district courts have split on the issue. *See, e.g., Downs v. Gebco Machine, Inc.*, 873 F. Supp. 2d 1010, 1012-14 (S.D. Ill. 2012) (individual liability inappropriate under EPA); *Harris v. City of Harvey*, 992 F. Supp. 1012, 1013 (N.D. Ill. 1998) (no individual supervisor liability under the EPA); *Holliday v. WSIE 88.7 FM Radio Station*, 2005 WL 3312633, at *5-6 (S.D. Ill. Dec. 7, 2005) (supervisor liability appropriate under EPA); *Mirza v. Dep't of the Treasury*, 1994 WL 30551, at *3 (N.D. Ill. Feb. 3, 1994). The essential dispute is whether the EPA should be construed as part of the Fair Labor Standards Act, to which it was physically added and which provides for individual supervisor liability; or interpreted as a sibling to other employment discrimination statutes like Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act, which do not allow for such liability. *Harris*, 992 F. Supp. at 1013.

The court need not decide this issue in the present case: here, it is clear that even if individual liability is appropriate, the defendants can establish a statutory defense, so the court will address the claim on its merits, rather than determining whether individual liability lies under the EPA. Even assuming that Finke can establish a prima facie case, IPFW has established a bona fide, gender neutral reason for paying Finke less than other

male deans: specifically, that it relies on CUPA data in setting salaries for its deans, and according to those metrics, deans of nursing programs are paid less than deans of other programs – as relevant here, Engineering, Business, Arts and Sciences, and Visual and Performing Arts.  Under the EPA, the marketplace value of the skills of a particular individual is an appropriate consideration for determining an employee's salary.  *Cullen*, 338 F.3d at 703 (citing *Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994)).  An employer must match or exceed what other potential employers are willing to pay if it wants to hire a capable staff, and a salary that a worker could receive in another job is considered "a factor other than sex" under the EPA.  *King v. Acosta Sales and Mkt'g, Inc.*, 678 F.3d 470, 473-74 (7th Cir. 2012).

Here, the CUPA numbers, which represent what the marketplace is willing to pay deans in various academic disciplines, bear out exactly the scenario that IPFW's salary data presents: some colleges, like business and engineering, pay higher salaries to their deans than do nursing programs, because the marketplace has placed a higher value on those programs in higher education.

Finke has conceded that IPFW uses CUPA data to set salaries.  Instead, she argues that IPFW paid many of its deans *more* than the CUPA median salaries and that this somehow means that IPFW is not, in fact, using the data to set salaries.  This ignores that Finke herself was paid more than the CUPA median, just as some of her male counterparts were (notably, some male deans were paid less than the median).  And IPFW's failure to pay its deans the *exact* median amount doesn't indicate that its reliance on the CUPA median is not bona fide – it's simply a demonstration of how medians

work: some salaries will fall above that number, and some will fall below. Accordingly, Finke's EPA claim fails, and summary judgment is appropriate.

    **B.**    **Title VII**

To establish a sex discrimination claim under Title VII, as discussed above, Finke can proceed under either the direct or indirect method. *Hildebrandt v. Illinois Dep't. of Nat. Rsrcs.*, 347 F.3d 1014, 1029 (7th Cir. 2003). Under the direct method, Finke must present either an admission of prohibited animus or statements or conduct from the decisionmaker from which forbidden hostility may be inferred. *Morgan*, 724 F.3d at 995. However, ". . . merely showing that a man and a woman who perform different jobs for the same employer are paid differently does not get a Title VII plaintiff to first base." *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 772 (7th Cir. 2007). And this is all that Finke has presented to support her argument that she was paid less than male deans of other colleges: she has asserted that she was paid less than some other male deans, which is true, but there's no evidence whatsoever that links her lower salary to a discriminatory animus. Accordingly, she must proceed under the indirect method.

As discussed above, to proceed under the indirect method, Finke must show that she was a member of a protected class, she was meeting her employer's legitimate expectations, she suffered an adverse employment action, and IPFW treated a similarly situated man more favorably. If she can establish a prima facie case, the burden shifts to the defendants to provide legitimate reasons for the disparity, and if it can do so, then the burden shifts back to Finke to show that the proffered reasons are pretextual. *Cullen*, 338 F.3d at 704.

Here, Finke's claim again falters. First, as discussed at length above, there is ample evidence that Finke was not meeting her employer's legitimate performance expectations, and thus, her claim fails there. Second, even assuming that Finke could establish a prima facie case, IPFW has proffered a legitimate reason for the disparity: the median salary in the marketplace, according to the CUPA, for a position like Finke's, Dean of the College of Health and Human Services, is lower than in IPFW's other colleges. Finke's argument that this is pretextual – that the deans were not paid the exact median salaries – is simply unavailing for the reasons discussed above. Accordingly, summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Dismissal [DE 49] is **GRANTED IN PART** and **DENIED AS MOOT** in part. The motion for summary judgment [DE 51] is **GRANTED** on all remaining counts. The Clerk is **DIRECTED** to enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED.

ENTERED: June 30, 2014


_____/s/ JON E. DEGUILIO_____
Judge
United States District Court